STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
RACHEL N. RIVERS (#291283)
rrivers@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **DALENE BRAMER**; and **JOSEPH GABANY**, <br><br> Plaintiffs, <br> v. <br><br> **PACIFIC GAS AND ELECTRIC COMPANY**; and **PG&E CORPORATION**, <br><br> Defendants. | **COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PARTIES ................................................................................................................... 3

   I.   Plaintiffs .......................................................................................................... 3

   II.   Defendants ...................................................................................................... 4

JURISDICTION ....................................................................................................... 4

VENUE ..................................................................................................................... 4

INTRADISTRICT ASSIGNMENT .......................................................................... 5

FACTUAL BACKGROUND ..................................................................................... 5

   I.   PG&E's Former Operation of the North Beach MGP ..................................... 5

      A.   Background - MGPs and Toxic and Solid Waste Associated Therewith........ 5

      B.   Overview of the North Beach MGP ...................................................... 11

   II.   PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous MGP Wastes at the North Beach MGP and/or the Vicinity Thereof, Including in the Present Location of the Property ........................ 13

   II.   The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or Disposed of by PG&E at and/or in the Vicinity of the Property May Present an Imminent and Substantial Endangerment to Health and/or the Environment ................. 14

      A.   PAH Levels Detected in the Property's Soil, Both in the Backyard and Under Plaintiffs' Home, Are Tens of Thousands of Times Higher than US/EPA Screening Levels for Cancer Risk........................................... 15

      B.   Lead Levels Detected in Soils on the Property Are So High in Places that They Qualify as Hazardous Waste................................................ 16

   III.   THE MGP CONTAMINATION OF THE PROPERTY HAS SEVERELY DISRUPTED BRAMER/GABANY'S PLANNED USE AND RENOVATION OF THE PROPERTY .................. 19

      A.   Without Knowledge of the Potential for MGP Wastes on the Property, Plaintiffs Purchased It with the Plan to Significantly Renovate the Home, while Raising Two Young Children in It ......................... 19

      B.   The High Level of MGP Contamination on the Property Effectively Bars the Intended Renovation of the Property Unless and Until It Is Extensively Remediated 20

      C.   The High Levels of MGP Contamination Has Effectively Rendered the Property's Backyard Useless and Has Caused Plaintiffs Significant Anxiety and Inconvenience.. 21

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT        i

IV.   PG&E AFFIRMATIVELY SOUGHT TO MISLEAD PLAINTIFFS AS TO THE HEALTH RISKS OF THE MGP WASTES AND CONCEALED ITS EXSISTANCE FROM PLAINTIFFS FOR SEVERAL YEARS ........................................................................................................ 23

A.   PG&E, Despite Knowing of the Likelihood that High Levels of MGP Wastes Existed on the Property, Conceales Such a Likelihood Until It Had a Plan to Minimize Its Liability ......................................................................................................................... 23

B.   PG&E Vigorously Resisted Efforts by Plaintiffs to Gain a Picture of the Full Extent of MGP Wastes on the Property, Even Misrepresenting to Plaintiffs that Any Lead Found on the Property Could Not Be from MGP Waste ............................................. 25

C.   PG&E Presented the Results of the Environmental Investigation of the Property in a Manner that Was Intended to Create a False Impression that the MGP Wastes Did Not Present a Human Health Risk ................................................................................ 28

V.   Plaintiffs Have Complied with the Notice Requirements under RCRA ......................... 29

CLAIMS FOR RELIEF ............................................................................................................... 29

COUNT 1
Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ...... 29

COUNT 2
Violations of California State Nuisance Law, Cal. Civil §§ 3479 *et seq.*  – Private Nuisance ..................................................................................................................................... 29

COUNT 3
Violations of California State Trespass Law ............................................................................. 30

COUNT 4
Violations of California State Negligence Law ......................................................................... 31

COUNT 5
Violations of California State Strict Liability Law .................................................................... 31

PRAYER FOR RELIEF ............................................................................................................... 32

DEMAND FOR JURY TRIAL .................................................................................................... 33

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                                                    ii

Plaintiffs Dalene Bramer ("Bramer") and Joseph Gabany ("Gabany," collectively with Bramer ("Plaintiffs" or the "Owners")) allege on information and belief, except as indicated, as follows, against Defendants Pacific Gas and Electric Company and PG&E Corporation (collectively, "PG&E"):

## INTRODUCTION

1.      This action arises out of contamination of Plaintiffs' home at 1645 North Point St. (the "Property"), resulting from PG&E's former operation, decommissioning, and demolition of a manufactured gas plant ("MGP"), known as the North Beach MGP, which was located in a several block area in the Northeast portion of the present day Marina Neighborhood that includes the Property.

2.      The North Beach MGP was a highly polluting, low-tech refinery, which PG&E—inclusive of its direct predecessor—used, from the late nineteenth century through the 1950s, to create gas from coal, and later oil, as well as a combination of coal and oil, that was then pumped in pipes to (mainly residential) consumers for lighting, cooking and heating in their vicinity.

3.      The historical footprint of the North Beach MGP, inclusive of the Property, is contaminated with a variety of solid and/or highly toxic waste that resulted from the operation, decommissioning, and/or demolition of the MGP (collectively, "MGP Wastes").

4.      The soil of the Property—which sits roughly on top of the former location of the North Beach MGP's "scrubbers"—is highly contaminated with MGP Wastes that contain, without limitation, highly toxic levels polyaromatic hydrocarbons or "PAHs" and lead. Testing on the Property has revealed **PAH levels approximately 62,800 times higher than the level considered safe** by the United States Environmental Protection Agency ("USEPA") and **lead at levels approximately 56 times higher than that considered dangerous** by the California Department of Toxic Substances Control ("DTSC") and well over what would be considered hazardous waste by most regulatory authorities.

5.      The MGP Wastes contamination on the Property may present—in fact, almost certainly presents—an imminent and substantial endangerment to human health and the

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

environment, generally, and to Plaintiffs and their four-year-old twins, in particular. As the DTSC has recognized, "a toddler who plays on bare soil, exhibits hand-to-mouth behavior, and therefore ingests higher- than-average amounts of soil." Furthermore, the short stature of young children make them much more likely to ingest airborne contaminants in both air vapor and dust. This combination creates very high risk of PAH and lead poisoning for Plaintiffs' children.

6.      Thus, after learning from a neighbor, soon after the birth of their twins, about the likelihood of MGP Wastes on their Property and the potential danger it posed to young children—facts about which PG&E had concealed from them—Plaintiffs only allowed their children to play in their backyard just twice. When Ms. Bramer saw her twins began kicking up dust as part of their play, the second time, she forbade them from ever playing there again.

7.      As a result, the backyard of the Property has been rendered effectively useless. Plaintiffs' children have been denied a backyard in which to play; and Plaintiffs, themselves, are prevented from engaging in any meaningful use of it. This is a particularly hard blow, given that when Plaintiffs purchased the home in 2009—without any knowledge or information regarding its potential or actual contamination with MGP Wastes (something of which PG&E was well aware at the time)—they did so, in large part, because the Property's extra large backyard seemed to provide an exceptional opportunity for their then-planned-for children to play outside in the city.

8.      Plaintiffs, furthermore, purchased the Property with specific plans to renovate and expand it, not only making it a nicer place to raise a family but also realizing the Property's value if put to its highest and best use. The previously undisclosed MGP Wastes on the Property has foreclosed this from Plaintiffs as well, making it economically impracticable (if not legally impossible without extensive remediation) to do the necessary construction.

9.      Thus, the Property's contamination with MGP Wastes has, in addition to causing Plaintiffs very significant stress and anxiety concerning the health risks it poses to themselves and their children, greatly impeded Plaintiffs' ability to use and enjoy the Property as they had planned.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                           2

10.     PG&E has known that the area including the Property is likely contaminated by MGP Wastes since at least the 1970s. It also knew that such wastes present an imminent and substantial endangerment to human health and the environment. Nonetheless, it only publically admitted its existence, when it was able to negotiate an arrangement with the California Public Utilities Commission that allows it to shift 90% of the costs of remediation to ratepayers.

11.     Indeed, even then, PG&E waited years to inform homeowners like Plaintiffs, or potential homeowners before they purchased, about contamination; and, once it did provide such information, it did so in ways that were intentionally misleading, both affirmatively and by omission. This includes, for example, affirmatively refusing Plaintiffs' requests that it test for lead on the demonstrably false position that any lead found would be from other sources.

12.     For four years, Plaintiffs have sought and failed to compel PG&E to meet its obligations to make Plaintiffs whole and fully abate the MGP Wastes on the Property in a manner that addresses the threats it may pose to human health and the environment, as well as the obstacles it poses to Plaintiffs' plans to put the Property to its highest and best use.

13.     Through this action Plaintiffs seek the Courts assistance in gaining that relief.

## PARTIES

### I.     Plaintiffs

14.     Plaintiff **Dalene Bramer** is an individual residing at, and is the owner with her husband and co-Plaintiff of 1645 North Point St., San Francisco, California (the "Property"). The Property, more specifically, means certain real property identified as assessor's parcel number 0460A-026 in San Francisco, California, 1645 North Point Street, San Francisco, California, together with all buildings, structures, fixtures, and every other type of physical improvement located at, on or affixed thereto, and all rights, including, without limitation, water rights, easements, licenses, permits, benefits, and interests appurtenant thereto or held by Plaintiffs in connection therewith. Plaintiffs reside at the Property with their four-year-old twins.

15.     Plaintiff **Joseph Gabany** is an individual residing at, and is the owner of the Property with his wife and co-Plaintiff.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                                    3

## II.   Defendants

16.   Defendant **PG&E CORPORATION** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California.

17.   Defendant **PACIFIC GAS AND ELECTRIC COMPANY** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California. Pacific Gas and Electric Company is the parent company of PG&E Corporation.

18.   Defendants Pacific Gas and Electric Company and PG&E Corporation, with their respective predecessors, successors, subsidiaries, and parents, are referred to collectively herein as "PG&E" or "Defendants."

19.   PG&E owned and operated the North Beach MGP during the relevant period and is responsible for the contamination caused thereby alleged herein.

20.   At all relevant times, each of the Defendants was an agent, servant, partner, alter ego, and/or joint venturer of his co-Defendant in the acts and omissions that have caused the injuries to Plaintiffs and was at all times, acting within the course and scope of said agency, service, partnership, conspiracy, alter ego status, and/or joint venture.

## JURISDICTION

21.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically, 42 U.S.C. §§ 6901 *et seq*. This Court has supplemental jurisdiction over the claims brought herein that arise under California state law, as they arise from a common nucleus of facts.

22.   An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court may grant declaratory relief, and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202, 33 U.S.C. § 1365, and 42 U.S.C. § 6972.

## VENUE

23.   Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to the claims at issue in this action

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

occurred in this judicial district. The MGP Waste contamination at issue is located in the City and County of San Francisco ("CCSF"). Furthermore PG&E is headquartered in the CCSF.

## INTRADISTRICT ASSIGNMENT

24.     This action substantially arises out of actions in the CCSF. Thus, under Civil L.R. 3-2(d) this action is to be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

### I.     PG&E's Former Operation of the North Beach MGP

#### A.     Background - MGPs and Toxic and Solid Waste Associated Therewith

25.     As the name suggests, manufactured gas plants ("MGPs"), including the North Beach MGP, were plants that manufactured gas used for lighting, heating, and cooking purposes throughout most of the nineteenth century and the first half of the twentieth century.

26.     MGPs were essentially refineries that processed coal and crude oil into a gas. The manufacturing process used in MGPs, including the North Beach MGP, for "synthetic fuel gases" (also known as "manufactured fuel gas," "manufactured gas" or simply "gas") typically consisted of the gasification of combustible materials, almost always coal, but also oil, and, especially in the later period of their operations, a combination of coal and oil. The coal and/or other fuel stock were gasified by heating it in enclosed ovens with an oxygen-poor atmosphere.

27.     The fuel gases generated by MGPs, including the North Beach MGP, were mixtures of many chemical substances, including hydrogen, methane, carbon monoxide and ethylene, as well as sulfur and tar acids like phenol and cresol and acid/caustic hydrocarbon sludges. The coal gas generated by MGPs, including the North Beach MGP, furthermore contained significant quantities of unwanted sulfur and ammonia, as well as heavy hydrocarbons. Thus, gases manufactured by MGPs, including by the NOB MGP, needed to be purified before they could be used.

28.     The purification occurred in portions of the MGPs referred to as "scrubbers" or "purifiers." The Property sits at the historical location of the North Beach MGP's scrubbers, which were used to clean the gas produced in the facility's retorts before it was piped to customers.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

29.     Once manufactured, the gas manufactured by an MGP, including the North Beach MGP, would be pumped directly to residential and other users through pipes. Thus, as is the case with the North Beach MGP, the plants were often situated in close vicinity to residential areas.

30.     MGPs, including the NOB MGP, consisted of several component operations/buildings, often colloquially referred to collectively as "gas-works," spread across an area of several city blocks.

31.     The various facilities of MGP sites were generally connected by extensive networks of pipes, which, in turn, also connected the MGP with its customers or other MGPs.

32.     The chemical substances created during the process of manufacturing gas, including in the process used by the North Beach MGP, included chemicals that were highly acidic/caustic themselves, such as hydrogen sulfide, tar acids like phenol and cresol and acid/caustic hydrocarbon sludges, as well as chemical substances that became highly acidic when exposed to air and or water, such as sulfur dioxide. Furthermore, acidic solutions, including sulfuric acid, was used to clean ammonia out of the gas in the scrubbers of the facility, including in the scrubbers of the NOB MGP, formerly located in an area that now includes the Property.

33.     During the period MGPs were being constructed and were in operation, it was standard industrial practice to paint with lead-based paint and use lead for many construction and maintenance purposes, including for plumbing joints and repairs. Furthermore, in the case of MGPs, specifically, large amounts of acidic/caustic chemicals were created and used in the MGP processes. Thus, those portions of an MGP facility, including the North Beach MGP, in which gas was created, stored, transported, or treated—including the scrubbers—needed to be able to withstand highly acidic conditions. Thus, lead was used in materials used to construct and maintain the piping and facilities of MGPs, including the North Beach MGP.

34.     In the soils of the Property there are extremely high levels of lead in locations where building debris from the North Beach MGP and other MGP Wastes are also found.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                    6

35.    The heart of an MGP, including the North Beach MGP, was the "retort bench," which would generally be housed in its own building known as the "retort house." The retort house of the North Beach MGP was located at the present Northwest corner of Buchanan St. and North Point St., roughly 150 feet from the Property.

36.    The retort bench was the construction in which the retorts were located. Retorts, including those of the North Beach MGP, were enormous oven-like machines where the coal and/or other fuel stock would be heated and the gas evolved. Retorts, including that of the North Beach MGP, did not completely carbonize fuel stocks, resulting in wastes consisting of partially carbonized coal and/ other feedstocks.

37.    In the soils of the Property, there are significant amounts of wastes consisting of this type of partially carbonized coal and/or other feedstocks. In the boring logs from sampling on the Property there are numerous entries described as "clinker-like material" and "asphalt-like material," including at locations very close to the surface as well as several feet below ground surface ("bgs"). Furthermore, testing of soils taken from locations at which these types of materials were encountered contained very high levels of PAHs.

38.    For example, at a testing location named 0460A026-HA02, the boring logs read *alia*: "At 0.5 ft, dark brown poorly graded SAND with silt, moist, contains some brick fragments, mortar fragments, 10% asphalt-like material (ALM)[.] At 2.0 ft, contains clinker-like material up to 1.5 in. in size in soil matrix[.]" The results of soil testing from this location presented in Benzo(A)Pyrene Equivalent or "B(a)PQ"—which presents a cumulative description of PAH content—include a reading of 668.86 at 1.8 feet below ground surface ("bgs"). That is a level almost 42,000 times higher than the US/EPA's human health risk based residential screening level.

39.    Within the retort house, including that of the North Beach MGP, on top of the retort benches were "hydraulic mains," in which the gas evolved from the fuel stock, as well as coal tar and ammoniac liquor and other wastes would collect through pipes that carried off the gas from the retorts. One of the principal purposes of these hydraulic mains was to draw off some of the large amounts of wastes.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                                                    7

40. Even with the drawing off of wastes by the hydraulic mains, the gas coming directly from the bench, including that of the North Beach MGP, was a noxious, highly acidic soup of chemicals. Components of that soup that needed to be reduced in quantity before the gas was distributed included: coal tar, which could be sold; ammonia, which could also be sold; naphthalene; and hydrogen sulfide. The main components of the North Beach MGP used to accomplish this reduction were the scrubbers and purifier, to which gas from the retort house was piped for this type of refining.

41. The Property sits at the location of the Northwest corner of the North Beach MGP's scrubbers. This, like the scrubbers of other MGPs, was used principally to remove ammonia from the gas. The process used in the scrubbers on the North Beach MGP involved a large amount of highly acidic, caustic and corrosive sulfuric acid solution. Accordingly, the materials used to construct and maintain the North Beach MGP's scrubbers, as well as the associated piping, had to be resistant to acids. Untreated bricks, mortars, iron, concrete, and steel are all vulnerable to degradation as result of acid. Lead and lead alloys, on the other hand, have very good corrosion resistance to acids, generally, and sulfuric acid, specifically. Accordingly, the North Beach MGP's scrubbers, as well as the associated piping, was built and maintained with materials that contained high levels of lead.

42. Soil samples taken from the Property contain high amounts of lead, including several readings at well over 1000 milligram/kilogram ("mg/kg"), in contrast with the DTSC's health screening level of 80 mg/kg. The lead on the Property was found at depths from .5 feet bgs to 10 feet bgs, and at locations at which brick and/or mortar debris was found, as well as very high levels of PAHs.

43. When the scrubbers and other portions of North Beach MGP were decommissioned and demolished after the 1906 earthquake and/or later, the debris wastes were spread across the North Beach MGP site, including the present location of the Property.

44. The lead encountered in the soil of the Property is from this debris waste as well as wastes created when piping and other portions of the facility were left in place.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                          8

45. Once through the scrubbers, the gas would then be piped to, and stored in, what was referred to as "gas holders" made of brick, stone, concrete, steel, or wrought iron, until pumped to customers.

46. The North Beach MGP had two gas holders: one at the current corner of Buchanan St. and Bay St.; the other taking up approximately half a block between North Point St. and Bay St., on the Laguna St. side. The North Beach MGP's gasholders were in use by PG&E until the 1950s. After the North Beach MGP stopped manufacturing gas, itself, the gasholders were used to store gas made at other MGPs, before being piped from the tanks to customers.

47. In addition, gas works often had various other facilities within their footprints. Those of the North Beach MGP not already discussed include: a purifying house, a generator house, tar wells, and crude petroleum tanks.

48. From their inception, MGPs had the reputation for being dirty and polluting, both as to the smoke and the waste their operations created, and the North Beach MGP was no exception. The wastes produced by MGPs, including by the North Beach MGP, are persistent in nature, and still contaminate the site of North Beach MGPs, including the Property.

49. In the process of both the operation and the decommissioning of MGPs, including the North Beach MGP, large amounts of waste were generated, much of which contain chemicals classified as "toxic pollutants" by the US/EPA. These include:

- Total petroleum hydrocarbons ("TPH"), which are mixtures of chemicals found in MGP feedstock and waste products.

- Volatile organic compounds ("VOCs"), including benzene, toluene, ethylbenzene, and xylenes (collectively, "BTEX"), which were created from volatile content of feedstock coal or from enrichment and carburation oils as released and formed under heating in absence of oxygen and reformed in condensation cooling.

- Semivolatile organic compounds, primarily PAHs, which were created in the same way as the VOCs.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

- Cyanide group compounds ("Cyanogens"), which was a process waste formed from nitrogen taken in with air and carbon present in the process and related to retort air leaks or the use of coal rather than coke for reactor beds.

- Metals, specifically arsenic and lead. One source of these metals was as trace elements from feedstocks, which is associated with purifier box wastes. More significantly, lead was used in paint, as caulking, in pipework, for roofing, in batteries, and as lead arsenate insecticide, as well as in maintenance activities where the common pit-putty was an equal-parts (by weight) mixture of red lead, white lead, and litharge, which is essentially lead oxide. Additionally, mortars used in the MGP contained litharge mixtures, which a contemporaneous source described as having "long been used for cements, for they form a workable, quick-setting mortar which sets with slight expansion into a hard, strong, chemically resistant material." These lead-laden materials were used in the construction and maintenance of scrubbers, including that of the North Beach MGP, which had to contain highly acidic materials.

50.     The form these wastes found on the Property includes coal residue solids, including partially carbonized coal, which contain high levels of toxic PAHs. Many of the PAHs associated with MGP Wastes are known carcinogens and are identified as "toxic pollutants" by the US/EPA under 40 C.F.R. § 401.15. PAHs, in general, are recognized as extremely hazardous compounds to human health and the environment. Not only are many known carcinogens, they are also lipophilic, meaning they can dissolve into fats, a characteristic that allows them to easily cross biological membranes and accumulate inside humans and other organisms. PAHs are also genotoxic, meaning that once accumulated in a human or other organism they damage the genetic information within the organism's cells, causing mutations.

51.     Another form taken by MGP Wastes that have been found on the Property is in the form of building debris, which contains both high levels of lead and PAHs.

52.     While the wastes created by the North Beach MGP were distinctly twentieth century in nature in terms of their toxicities and form, the handling and disposal methods used by PG&E did not account for that.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

53.     Accordingly, the Property was contaminated by the North Beach MGP through mechanisms including: leaks and accidental spills from the scrubbers and/or other MGP facilities, as well as the piping that connected them; on site disposal of MGP Waste; as well as the demolition and decommissioning of the MGP.

54.     Concerning the latter, a utility industry publication admits, "Much general debris from site clearance is found [at former MGP sites, where] material may simply have been spread over the whole site." According to the authoritative treatise on MGP sites, "it was industry gasworks demolition practice, through the 1960s, to remove all aboveground structures and piping and to carry the demolition to about 30 cm below existing ground," where "[a]t this final demolition grade, piping was severed, leaving the subsurface remainder in place."

55.     PG&E indicated to Plaintiffs that the North Beach site had just been bulldozed over and that materials had not been removed.

56.     The traditional pathways for contact between these wastes and humans and/or the environment include direct contact with contaminated soils—including through accidental ingestion—and contact with toxic vapor off gassing from contaminated soils.

**B.     Overview of the North Beach MGP**

57.     In 1891, the San Francisco Gas Light Company—which changed its name to San Francisco Gas & Electric Company, in 1896—constructed and began operation of the North Beach MGP. This facility processed coal and, during the later period of its operation, other hydrocarbons, such as crude oil, often in combination with coal, into gas which was then pumped through pipes to houses and businesses in the area for cooking, heating and lighting.

58.     San Francisco Gas & Electric Company continued to operate the NOB MGP until 1905, when San Francisco Gas & Electric Company was merged with the California Gas and Electric Corporation to form Defendant Pacific Gas and Electric Company. As referred to herein, "PG&E" is inclusive of its predecessor San Francisco Gas & Electric Company.

59.     PG&E continued to operate the NOB MGP until the 1950s, though some portions of the facility were, following their damage in the 1906 earthquake, demolished by PG&E. The demolition involved leaving certain subsurface components in place, including

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                           11

underground piping and tanks and spreading demolition debris on the footprint. Much of this debris contained high levels of lead, as well as PAH contamination.

60.     PG&E has admitted to liability for the contamination caused by North Beach MGP.

61.     The North Beach MGP Site is comprised of at least four city blocks bounded by Marina Boulevard, Buchanan Street, North Point Street, Laguna Street, Bay Street, and Webster Street, designated by the City and County of San Francisco Office of the Assessor-Recorder as Blocks 0459, 0460A, 0445A, and 0463B. The site also includes a triangular area of vacant land and paved parking (Marina Green) situated northeast of Marina Boulevard.

62.     A schema prepared by agents of PG&E showing the footprint of the North Beach MGP, with certain of the facilities that made up its gasworks, laid over an area of the modern day Marina neighborhood, is attached hereto as Exhibit A. The schema shows *inter alia* that the gasworks included a large retort house, a purifying house, scrubbers, tar wells, gasholders, deep wells, and crude petroleum tanks.

63.     The Property is located in the Northwest corner of the North Beach MGP's scrubbers. The scrubbers were used to extract various toxic and otherwise noxious elements of the gas created in the retorts, before it was piped to customers.

64.     A map from the years following the Great Earthquake of 1906 shows the partially damaged structures of the North Beach MGP. It further shows that facilities consistent with and in addition to those presented on Exhibit A. These include facilities titled "tar refinery," "tar tanks," and "tar vats." The refinery was located in the middle of present day Beach St. at a location immediately South of where the schema indicates a "tar well" was located. Other components were located North of this location, including the tar tanks. The map further shows a boiler located north of these tanks.

65.     The map also shows that immediately West of MGP was a canal opening up to the Bay that extended South to the approximate location of present day North Point St. and West to the approximate location of present day Webster St. This can also be seen in the map below. The canal was filled in approximately 1912.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                          12

66.     Testing that has been done so far indicates that the Property is located in a hotspot of contamination associated with the North Beach MGP



## II.   PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous MGP Wastes at the North Beach MGP and/or the Vicinity Thereof, Including in the Present Location of the Property

67.     During the course of its operations of the North Beach MGP and during the process of its decommissioning, demolition and closure of the North Beach MGP and/or portions thereof, PG&E handled, stored, treated, transported and/or disposed of solid and/or hazardous MGP Wastes at the North Beach MGP and/or the vicinity thereof, including in the present location of the Property.

68.     The operation that the North Beach MGP centered on was the separation of gas from coal and/or oil and then the purification of the gas. During these processes, significant amounts of solid and hazardous toxic wastes were created, handled, stored, transported and/or disposed of at various locations within the grounds of the North Beach MPG, including the current location of the Property.

69.     Furthermore, high levels of lead were used in the materials employed by PG&E to build and repair the North Beach MGP facilities. Upon decommissioning, demolition, and/or

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                 13

closure of the North Beach MGP and/or portions thereof, PG&E left debris from the decommissioned, demolished, and/or close facilities in place and/or disposed of the debris onsite, including at or near the present location of the Property.

**II.** **The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or Disposed of by PG&E at and/or in the Vicinity of the Property May Present an Imminent and Substantial Endangerment to Health and/or the Environment**

70.     PG&E's handling, storage, treatment, disposal and/or transportation of solid and/or hazardous MGP Wastes at and/or in the vicinity of the Property have resulted in the contamination of the Property's soil and air. This contamination may present (in fact, almost certainly presents) an imminent and substantial endangerment to health and/or environment.

71.     The concentrations of the MGP Waste contaminants detected to date on the Property are significant and may present an imminent and substantial endangerment to health and/or the environment in the future.

72.     The environmental investigations thus far conducted of the Property indicate that it is contaminated by high levels of MGP Wastes in the form of both organic compounds—particularly, PAHs—and inorganic compounds—particularly, lead. These wastes have been identified as deeply as the investigation samples were collected. Therefore, no clean horizon has been established at the Property. These wastes have also been identified near, or at, the surface of the Property, raising significant immediate concerns for human health, especially given the young age of Plaintiffs' children.

73.     In September and November of 2015, an environmental investigation was conducted by PG&E's contractor Haley & Aldrich ("H&A") at the Property. During the investigation, samples were collected from shallow soil at depths of up to ten feet bgs, at locations under the slab and in the yard.

74.     MGP Wastes were identified via multiple lines of evidence throughout the soil of the Property during the Investigation. This included very elevated levels of PAHs and lead, as well as observations of clinker or asphalt material, often intermixed with brick and mortar debris. Such intermixing corroborates the conclusion that the observed contamination is a result

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                              14

of MGP Waste. Brick was the predominant building material of MGP structures at the North Beach MGP, and was a common waste product from routine replacement of brick retort benches. On the other hand, very few other buildings in the area were built with brick; and there is no evidence that fill was ever placed in the area.

75.     Additionally, in at least one location, HA02, which is near the entry to Mr. Gabany's garage office, not only were extremely high levels of PAH contamination found near the surface and continuing down to four feet, the boring logs indicate that the soil was "moist" (despite the samples being taken far above the water table and during a drought) and that a naphthalene odor was present. Consistent with the latter observation, a soil vapor sample from the location showed high levels of naphthalene.

A.     **PAH Levels Detected in the Property's Soil, Both in the Backyard and Under Plaintiffs' Home, Are Tens of Thousands of Times Higher than US/EPA Screening Levels for Cancer Risk**

76.     The benzo(a)pyrene (B(a)P)-toxic equivalent or "B(a)P EQ" levels from soils taken at referenced HA04A location were as high as 1004.86 mg/Kg compared to an US/EPA risk-based screening level of 0.016 mg/Kg.[1] In other words the PAH levels from this location were over **62,800 times** the US/EPA risk-based screening level.

- 669 mg/Kg, ~**42,000 times** the US/EPA risk-based screening level, at HA03, located immediately in front of the door to the backyard from the home;

- 353 mg/Kg, ~**22,000 times** the US/EPA screening level, at HA03, located in the middle of the backyard near the home;

- 682 mg/Kg, ~**42,600 times** the US/EPA screening level, at HA04, located on the Western edge of the backyard near its midway point;

- 286 mg/Kg, ~**18,000 times** the US/EPA screening level, at HA08, located in the middle of the backyard near its far end;

---

[1] Risk-based screening values are concentrations of chemicals, in various media, derived from a target excess risk level (for carcinogens) or hazard quotient (HQ, for noncarcinogens) under generic exposure assumptions. B(a)P EQ levels are based on a person's increased risk of developing cancer over a 30 year period.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                        15

- 900 mg/Kg, ~**56,300 times** the US/EPA screening level, at HA10, located on the Western edge of the backyard near its far end;

- 234 mg/Kg, ~**14,600 times** the US/EPA screening level, at HA11, located near the middle of the garage;

- 191 mg/Kg, ~**12,000 times** the US/EPA screening level, at HA12, located near the entrance of Mr. Gabany's office to the garage.

- 93 mg/Kg, ~**6,000 times** the US/EPA screening level, at HA13, located near the entrance of Mr. Gabany's office to the garage.

77.     These levels translate into significantly increased cancer rates for the entire family, but especially Plaintiffs' two young children, who are far more likely to incidentally ingest these contaminated soils. Indeed, recent studies have found that when a child grows up in an area with soils that are substantially contaminated with PAHs, his or her lifetime increased cancer risk is far higher than that of an adult living in the area for the same number of years, as such children ingest significant amounts of soil based PAHs in the form of contaminated dust and dirt.

78.     PAH exposure has also been associated with an increased likelihood of a woman giving birth prematurely.

79.     Cancer rates of persons living within and near the footprint of the North Beach MGP are high. At least two of Plaintiffs' close neighbors on North Point St. have been diagnosed with cancer in recent years, as have two persons who provide regular childcare to Plaintiffs' children in their home.

80.     The occurrence of premature births by persons living within and near the footprint of the North Beach MGP is also high; and after living in the home on the Property for approximately three years, Ms. Bramer gave birth to Plaintiffs' twins six and half weeks early.

### B.     Lead Levels Detected in Soils on the Property Are So High in Places that They Qualify as Hazardous Waste

81.     The residential soil risk screening level ("RSL") for lead of the DTSC, as well as the environmental screening level ("ESL") for lead of the California Regional Water Quality

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                          16

Control Boards, is 80 mg/kg. This regulatory guidance level was selected by the DTSC as an estimate of soil lead concentration that could increase a child's blood lead concentration by up to 1 µg/dL, concerning which it states: "the estimated incremental increase in children's blood lead that would reduce Intelligence Quotient (IQ) by up to 1 point." Furthermore, the threshold for characterizing lead contamination as a hazardous waste is, depending on the results of a leachate analysis, as low as just 50 mg/Kg, while a level of 1000 mg/Kg qualifies as a California Hazardous Waste regardless of leaching tests. Moreover, DTSC notes that "a toddler who plays on bare soil, exhibits hand-to-mouth behavior, and therefore ingests higher- than-average amounts of soil" which can results in "high exposure" to soil-based lead contamination."

82.    As expressed in the forgoing Table 1, the test results from the property greatly exceed these standards, reaching levels as high as 4460 mg/Kg, with very dangerous levels at all depths, including near the surface. The testing also identified very high levels of arsenic.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT

17

Table 1

| Field Sample ID | Sample Depth | Arsenic | Lead |
|---|---|---|---|
| 0460A026-PB-EAST | 0.25 | 19.9 | 640 |
| 0460A026-PB-WEST | 0.25 | 22.4 | 490 |
| 0460A026-HA7A-SO-0.4 | 0.4 | 25.0 | 231 |
| 0460A026-HA04-SO-0.5 | 0.5 | 15.7 | 299 |
| 0460A026-HA07-SO-0.5 | 0.5 | 24.4 | 464 |
| 0460A026-HA08-SO-0.5 | 0.5 | 21.2 | 488 |
| 0460A026-HA09-SO-0.5 | 0.5 | 10.8 | 220 |
| 0460A026-HA10-SO-0.5 | 0.5 | 16.0 | 246 |
| 0460A026-HA11-SO-0.5 | 0.5 | 4.41 | 267 |
| 0460A026-HA14-SO-0.5 | 0.5 | 22.8 | 274 |
| 0460A026-HA05-SO-0.6 | 0.6 | 27.8 | 268 |
| 0460A026-HA06-SO-0.8 | 0.8 | 16.3 | 257 |
| 0460A026-HA06-SO-1.4 | 1.4 | 15.5 | 118 |
| 0460A026-HA08-SO-1.5 | 1.5 | 11.1 | 404 |
| S-HA08-1.5 | 1.5 | 15 | 440 |
| 0460A026-HA04-SO-3.0 | 3 | 10.1 | 304 |
| 0460A026-HA05-SO-3.0 | 3 | 4.35 | 178 |
| 0460A026-HA08-SO-3.0 | 3 | 10.0 | 205 |
| 0460A026-HA09-SO-3.0 | 3 | 4.32 | 91.9 |
| S-HA09-3.0 | 3 | 5.4 | 110 |
| 0460A026-HA10-SO-3.0 | 3 | 9.79 | 732 |
| 0460A026-HA11A-SO-3.0 | 3 | 3.92 | 429 |
| 0460A026-HA12A-SO-3.0 | 3 | 3.44 | 125 |
| 0460A026-HA14-SO-3.0 | 3 | 13.6 | 1280 |
| 0460A026-HA04-SO-3.5 | 3.5 | 8.51 | 399 |
| 0460A026-HA05-SO-3.5 | 3.5 | 4.14 | 369 |
| 0460A026-HA10-SO-3.5 | 3.5 | 9.62 | 605 |
| 0460A026-HA11A-SO-3.5 | 3.5 | 3.71 | 791 |
| 0460A026-HA12A-SO-3.5 | 3.5 | 3.34 | 107 |
| 0460A026-HA14-SO-3.5 | 3.5 | 20.1 | 4460 |
| 0460A026-HA04-SO-4.0 | 4 | 11.1 | 281 |
| 0460A026-HA10-SO-4.0 | 4 | 8.62 | 446 |
| S-HA10-4.0 | 4 | 11 | 320 |
| 0460A026-HA11A-SO-4.0 | 4 | 3.32 | 167 |
| 0460A026-HA14-SO-4.0 | 4 | 14.5 | 1820 |
| 0460A026-HA04A-SO-5.0 | 5 | 9.23 | 198 |
| 0460A026-HA10-SO-5.0 | 5 | 3.28 | 128 |
| S-HA10-5.0 | 5 | <7.5 | 110 |
| 0460A026-HA14-SO-5.0 | 5 | 13.9 | 1650 |
| 0460A026-HA04A-SO-10.0 | 10 | 6.36 | 1750 |
| 0460A026-HA13A-SO-10.0 | 10 | 2.32 | 93.7 |

83.     These dangerous levels of inorganic contaminants, particularly lead, in the Property's soil are the result of MGP Wastes. This is indicated by, without limitation, evidence

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

of the intermixing of elevated lead with plant demolition debris and PAHs, the high levels of lead found at depth, and frequent use of lead in the maintenance and construction of MGP facilities to address the highly acidic nature of chemicals produced in the MGP processes. It also includes the lack of evidence that any artificial fill, other than demolition debris of the MGP itself, was ever placed on the Property. All of this strongly indicates that the elevated lead is MGP Waste and is not attributable to the historical use of residential lead paint, fill, or any other source.

III. **THE MGP CONTAMINATION OF THE PROPERTY HAS SEVERELY DISRUPTED BRAMER/GABANY'S PLANNED USE AND RENOVATION OF THE PROPERTY**

A. **Without Knowledge of the Potential for MGP Wastes on the Property, Plaintiffs Purchased It with the Plan to Significantly Renovate the Home, while Raising Two Young Children in It**

84.    When Plaintiffs purchased the Property in 2009, they did so primarily based on two characteristics that appeared to make the property uniquely suited for their planned family.

85.    First, the Property had a very large backyard when compared to both properties in San Francisco, generally, and properties in the Marina, specifically. This was very important for Plaintiffs: they wanted their children to have a backyard in which they could play; and they wanted a yard that they, themselves, could use and enjoy.

86.    Second, the property provided good opportunities for expansion and renovation. Plaintiffs needed a home that could be expanded to meet their needs as their family grew. Furthermore, they wanted a home that they could expand to include a home office for Mr. Gabany.

87.    While PG&E was well aware, in 2009, of the strong likelihood that the Property was heavily contaminated with MGP Wastes, Plaintiffs had no idea this was the case when they purchased the Property. Indeed, Plaintiffs did not discover that the Property was likely contaminated until late 2011, when an acquaintance reacted to Mr. Gabany's statement that he intended to renovate the Property with the unfortunate information that because of the likelihood of MGP Wastes on the Property, their planned renovation would be very difficult, if not impossible.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                          19

88.     Plaintiffs never received a formal, or even personally addressed, notice from PG&E that the Property was even possibly contaminated. Rather, sometime after moving in they received in the mail only very generic, massed mailed, community updates, which referenced a "North Beach" MGP and indicated that there was nothing to be concerned with, specifically as to human health. Plaintiffs, accordingly, disregarded the notices, thinking that they did not apply to them and were nothing about which they needed to be concerned.

**B.      The High Level of MGP Contamination on the Property Effectively Bars the Intended Renovation of the Property Unless and Until It Is Extensively Remediated**

89.      Consistent with the information Mr. Gabany received in late 2011, the concentrations of MGP Wastes in soil at the property have severe implications for Plaintiffs' planned renovation of the Property, effectively halting it.

90.     Plaintiffs' planned renovation of the Property would, as would any renovation of the Property to put it to its highest and best use, involve a substantial expansion of its footprint and overall size, which would require *inter alia* the construction of a new foundation and reconfiguration of existing below slab utilities.

91.     Accordingly, absent remediation that included extensive remediation under the slab of the home on the Property, excavation of soils under the existing home and in its intended extended footprint, as would be required to do the planned renovation, would have to be conducted by personnel with appropriate OSHA HAZWOPER training, and extraordinary measures to preclude dispersal of impacted dust would also be required; standard construction dust mitigation measures would be insufficient.

92.     Waste soils would also require special handling and disposal as state and federal hazardous waste regulations would apply. Indeed, the City and County of San Francisco Department of Health, indicated, in response to the Plaintiffs' submission of renovation plans for the Property, that in connection with the planned renovation, Plaintiffs would be required to submit a site mitigation plan that would include post-excavation testing of soils "since historical data demonstrates that petroleum hydrocarbon and metal contamination may be present."

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                           20

93.     In this context, it would be economically impracticable for Plaintiffs to renovate the Property as intended or for the Property to be put to its highest and best use, absent remediation of soils below the existing home and in its intended extended footprint.

**C.     The High Levels of MGP Contamination Has Effectively Rendered the Property's Backyard Useless and Has Caused Plaintiffs Significant Anxiety and Inconvenience**

94.     Upon Plaintiffs' discovery, in 2011, that the backyard was likely contaminated with MGP Waste, the yard was rendered effectively useless. Indeed, it became a source of anxiety and worry for Plaintiffs rather than a resource for them and their children to enjoy.

95.     One of the major reasons Plaintiffs chose the Property was that it had a backyard in which their then-planned children could play.

96.     Following the birth of their children in 2012, Plaintiffs have only allowed their children to play in the backyard for a short period on two occasions. On the second occasion, their children began kicking the dirt of the yard causing it to become airborne and thus ingested by them. Ms. Bramer, fearing this could expose them to health risks, quickly put an end to their play. Since then, she has not allowed them to play again in their backyard.

97.     Ms. Bramer's fear was well founded. When testing was finally conducted on the Property, following significant delays caused by PG&E's positions concerning the testing for lead and other issues, it showed very high levels of both PAH and lead contamination near the surface of the yard.

98.     It is well known that young children are particularly vulnerable to the effects of lead exposure. Furthermore, it is well established that incidental ingestion poses a far greater risk as an exposure pathway for young children than for adults; and concerning increased cancer risk from soil-based PAH contamination, in particular, studies have shown that the increased cancer risk of someone living their entire life near PAH contaminated soil is principally the result of exposure during the person's first 18 years of life, the great majority of which is from incidental ingestion, as a child.

99.     The contamination of the backyard has also effectively prevented its use by Plaintiffs. When Plaintiffs purchased the Property, the yard, while large, was completely un-

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                    21

landscaped, mainly consisting of a weedy lot with a couple of trees. Thus, high on the list of their renovation plans was landscaping the yard, so that it could become a useable space for themselves and their guests. When Plaintiffs learned the soil was likely contaminated with MGP Waste, these plans were put on an indefinite hold and the yard has since remained in an unusable state.

100.    The impact of not being able to use the yard, either as a location in which their children could play or as a place which they could use for relaxation and entertaining, has been significantly exacerbated by Plaintiffs' inability to complete their planned renovation of the home as a result of the MGP contamination of the Property. Had Plaintiffs been able to complete their renovation of the Property, as planned, not only would the yard have been made useable, the home's useable square footage would have been significantly expanded. Instead, as a result of the contamination, Plaintiffs and their two young children not only have no backyard to use, they have been forced to live in a home that is both far smaller and less comfortable than they had reasonably expected.

101.    Plaintiffs, furthermore, have suffered, and continue to suffer, very significant anxiety, as a result of the risk and uncertainty of the MGP Wastes on the Property and PG&E's response to it.

102.    The high rates of cancer and premature births that have occurred within the footprint of the North Beach MGP, including within their own home, have greatly increased this anxiety, as has being saddled with a property that cannot be renovated as Plaintiffs had planned and which cannot be sold as is, without a substantial discount.

103.    PG&E has failed to adequately address the MGP Wastes, despite Plaintiffs' repeated requests that they do so, seeking to compel Plaintiffs to choose between an inadequate remediation that would leave large amounts of contamination in place and result in the permanent impairment of the Property's ability to be put to its highest and best use, and living on top of toxic waste known to cause cancer, premature births, and neurological impairment in children.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                                      22

**IV.   PG&E AFFIRMATIVELY SOUGHT TO MISLEAD PLAINTIFFS AS TO THE HEALTH RISKS OF THE MGP WASTES AND CONCEALED ITS EXSISTANCE FROM PLAINTIFFS FOR SEVERAL YEARS**

    **A.   PG&E, Despite Knowing of the Likelihood that High Levels of MGP Wastes Existed on the Property, Conceales Such a Likelihood Until It Had a Plan to Minimize Its Liability**

104.   By 2009, when Plaintiffs purchased the Property, PG&E knew that the Property was likely contaminated with MGP Waste. Indeed, at the time, PG&E was in the process of putting the final touches on its "environmental program" concerning the contamination, by which it believed it could strong-arm homeowners into accepting an inadequate remediation, based on incomplete testing, that left substantial amounts of MGP Wastes in place, while saddling the homeowner with a land use covenant that restricted the use of the property and thus decreased its value.

105.   PG&E was operating the North Beach MGP into the 1950s; and its management was periodically reminded thereafter of the fact MGP Wastes remained on, and in the vicinity of, its former location, including the Property.

106.   In 1977, test borings for a box sewer along Marina Boulevard found the area extensively contaminated with MGP tar, which a report identified as probably resulting from previous MGP activities in the area. PG&E, however, did nothing with this information.

107.   Then, in 1986, PG&E conducted a limited investigation of the soils of certain properties in the footprint of the North Beach MGP. Despite the results of these investigations showing high levels of PAHs, lead, and other toxins, PG&E did little more to address the contamination than send men out with rakes to remove the very topmost layer of it.

108.   Then, in 1991, a soil and groundwater investigation at a PG&E substation that sits in the former location of one of the North Beach MGP's gas holders showed significant levels of PAH contamination in both the soil and groundwater, including what is known as "free product" or pure MGP tar.

109.   Despite both the Regional Water Quality Control Board and the DTSC indicating to PG&E that the levels of contamination posed a threat to human health and the environment, PG&E ignored statements by the DTSC that an investigation of the entire site of the North

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                                    23

Beach MGP should be investigated. In fact, PG&E did not even remediate the location at which it found the contamination.

110.    In 1997, an environmental investigation at a nearby location in which PG&E was involved, again, turned up high levels of MGP Wastes, including high levels of naphthalene in shallow ground water.

111.    PG&E's response was to conduct a very limited remediation—a narrow landscaping strip along one side of the property was excavated a few feet deep and the area replenished with clean soil and new plants—which one regulator later described as a "scoop and run" operation.

112.    Only in 2010 after it had an arrangement with the DTSC and the California Public Utilities Commission that would allow it to address its liability for the contamination in a manner that was as cheap as possible, did PG&E make any effort to investigate the extent of the MGP Wastes contaminating the remainder of the former site of the North Beach MGP, including the Property, or inform residents that they were likely living on a toxic waste dump. In fact, PG&E affirmatively and intentionally took no action concerning MGP Wastes in the Marina for years because of corporate concerns that addressing the problem would be expensive.

113.    Under the deal PG&E ultimately negotiated with the DTSC, which is memorialized in a Voluntary Cleanup Agreement ("VCA"), PG&E reimburses DTSC for costs of evaluating and approving PG&E crafted investigations and remediations, the purpose of which is to eliminate PG&E's liability at the lowest possible cost. If PG&E wishes, it can terminate the VCA at its convenience; and DTSC lacks the authority to order PG&E to do anything.

114.    Under this arrangement, the DTSC has consistently acted in the interest of PG&E, rather than homeowners, such as Plaintiffs: failing to ensure that PG&E fully investigates the extent of MGP Wastes on properties—including allowing PG&E to forego testing for lead on properties and under slabs; approving remediations that leave large amounts of MGP Wastes *in situ*, demanding, instead, that the homeowner enter an LUC with the

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                   24

DTSC—substantially drafted by PG&E—that greatly restricts the ability of the homeowner or any subsequent owner to realize the property's highest and best use; and conducting its business with PG&E, behind closed doors, in violation of at least the spirit, if not the letter, transparency requirements under California State law.

115. PG&E, furthermore, secured an arrangement with the CPUC that allows PG&E to pass along 90% of its costs for activities done under the VCA to the rate-paying public, without the need for a review.

116. While working to craft this sweetheart deal with the DTSC and the CPUC, PG&E concealed from Plaintiffs evidence of the strong likelihood that MGP Wastes existed on their Property. Had Plaintiffs been aware of this evidence, they would not have purchased the Property, as the existence of the MGP Wastes has greatly impaired their ability to use and enjoy the Property as they had planned, and has exposed them, their young children, and others to carcinogens and other toxins.

**B. PG&E Vigorously Resisted Efforts by Plaintiffs to Gain a Picture of the Full Extent of MGP Wastes on the Property, Even Misrepresenting to Plaintiffs that Any Lead Found on the Property Could Not Be from MGP Waste**

117. Following their purchase of the Property, PG&E affirmatively misled Plaintiffs concerning MGP Wastes on the Property, as a source of lead contamination, with the goal of dissuading them from demanding that PG&E test for it; and PG&E, more generally, misled Plaintiffs concerning the health risks posed by the MGP Wastes on the Property and vigorously fought efforts by Plaintiffs to gain a complete picture of the Property's contamination.

118. Soon after Plaintiffs made contact with PG&E, a PG&E representative affirmatively misled Ms. Bramer concerning the risks posed to her and her family by the MGP Wastes on the Property. He told Ms. Bramer that it was safe for her and her family to use the backyard, unless they rubbed the soil from the backyard on their faces and ate it.

119. Soon thereafter, PG&E—without Plaintiffs' consent and without discussion with Plaintiffs as to its contents—caused a test plan for the Property to be posted DTSC's publically accessible website.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                    25

120.     Consistent with that take-it-or-leave-it approach, once negotiations concerning PG&E's testing of the Property began in November of 2013, they took over a year and half to complete. During this process, which literally resulted in over a dozen redlines, PG&E vigorously fought to minimize the extent of the investigation that it was required to do.

121.     While this took many forms—including resistance to testing under the slab of the home on the Property and misrepresentations concerning the applicability of local environmental regulations to subsequent work on the Property—the biggest fight was over Plaintiffs' demand that PG&E test for lead.

122.     PG&E not only refused Plaintiffs' request that the investigation include the testing of soil samples for lead, it affirmatively misrepresented to Plaintiffs that no lead found on the Property could be the result of MGP Wastes.

123.     In its April 24, 2015 markup of the proposed agreement for investigating Property, PG&E stated the following in justification of its deletion of cyanide and lead from the list of chemicals for which samples would be analyzed:

> Arsenic and lead are fairly ubiquitous in San Francisco. Naturally occurring arsenic is high in California while lead is high in SF due to sandblasting of paint, the Pan Pacific and other sources. PG&E has not found arsenic and lead as part of the MGP residues and the program does not include these substances.

124.     As PG&E was, and is, aware, lead has been found on properties in the footprint of the North Beach MGP, not only at the surface, but also at significant depth: sandblasting of paint cannot be the source lead found at depth, as lead from sandblasting paint would land on the surface of soils, and lead does not vertically migrate significantly in soils.

125.     PG&E was, and is, also aware that the Pan Pacific International Exposition (the "PPIE") could not be a significant source of any lead found in the Property's soils: there is no evidence of any offsite fill activities on the Property, let alone fill from the PPIE.

126.     Most insidious, its statement that "PG&E has not found arsenic and lead as part of the MGP residues" was clearly intended to convince the reader that PG&E had investigated whether MGP residues contained lead and found that they did not contain lead. In fact, PG&E had not only not conducted any such investigation—but rather had simply decided as a matter

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                   26

1    of policy not to test for lead—it had large amounts of information indicating that, in fact, MGP

2    Wastes in the North Beach footprint did contain large amounts lead. This included the results of

3    its testing of MGP Wastes on properties in 1986, in which PG&E *did* test for, and report the

4    levels of, lead in the soil, as well as the results of the waste characterizations that it was required

5    to conduct before shipping soils to a toxic waste disposal location. Furthermore, PG&E is, and

6    was, aware of the fact that lead was commonly used in the maintenance and construction of

7    MGPs and thus is a common constituent of MGP Waste.

8         127.    Thus, PG&E's above statements concerning lead were false and intended to

9    mislead Plaintiffs into believing that lead was not a contaminant of concern in connection with

10   the MGP Wastes contamination of the Property and to forego the testing for it. Given PG&E's

11   awareness at the time that Plaintiffs had two very young children and the well-known toxicity of

12   lead to young children, its efforts in this regard are additionally egregious.

13        128.    PG&E was so opposed to testing for lead, that Plaintiffs were only able to reach

14   an agreement that would result in any investigation of MGP Wastes on their Property by

15   agreeing that soil samples did not need to be tested for lead, unless after six months following

16   completion of the sampling, the Property had not been remediated. (Other homeowners from the

17   neighborhood were told by PG&E that if they wanted PG&E to test for lead, they'd have to

18   "sue" PG&E.).

19        129.    In the six months that passed after testing, PG&E refused to agree to a

20   remediation that was adequate to protect the health of Plaintiffs and their children and preserve

21   their ability to realize the Property's highest and best use.

22        130.    Thus, finally, and after further efforts by PG&E to prevent it, the soils were

23   tested for lead, in 2016.

24        131.    As summarized in Table 1 herein, which follows Paragraph 82, the results from

25   that testing show lead levels in soil samples from the Property, at depths from 0.5 feet bgs to 10

26   feet bgs at extremely and frighteningly high levels. If PG&E had its way, Plaintiffs would never

27   have discovered this.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                      27

**C.    PG&E Presented the Results of the Environmental Investigation of the Property in a Manner that Was Intended to Create a False Impression that the MGP Wastes Did Not Present a Human Health Risk**

132.    When PG&E, through its agent H&A, presented Plaintiffs the results of the environmental investigation of the Property, it did so in a manner that was intended to create a false impression that the MGP Wastes on the Property did not present a risk to the health of Plaintiffs or their young children.

133.    The first way in which PG&E did so was using a background PAH number, rather than a risk-based screening level, as reference point for the results.

134.    A risk-based screening level informs the reader of the extent to which a test result's toxicity exceeds a level that a regulatory authority deems safe. A background level number merely indicates the level at which certain toxins are found, on average, in the environment of a particular area. It says nothing about whether that level is safe or dangerous to human health.

135.    The background PAH level, expressed as B(a)P EQ used by PG&E in this way is 0.9 mg/kg, while the US/EPA screening level is .016 mg/kg. Thus, by using the background PAH level, rather than the US/EPA screening level, PG&E is able to reduce the apparent significance of the testing results by a factor of 56, creating the false impression that the negative health effects of the MGP Waste contamination is not as bad as it actually is.

136.    PG&E, furthermore, in its presentation of test results to Plaintiffs omitted the risk-based screening levels for several of the most important PAHs tested for. Indeed, while the test results list the various PAHs identified, PG&E intentionally omitted associated risk based screening levels, instead presenting only asterisks with a legend indicating that the "[p]otency of individual compound is accounted for in the evaluation of BaP EQ".  For these particularly dangerous chemicals, there is no indication in the presentation whether the levels of any particular PAH is concerning, including that the chemical concentrations are not bolded where exceeding risk-based screening levels, as other chemicals are presented. In fact, all of these chemicals included in a B(a)P EQ calculation have associated screening levels, and this fact is

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

completely obscured by PG&E comparing only their summed concentration with a non-risk based estimated background concentration.

137. PG&E, moreover, intentionally presented vapor data using an attenuation factor that is higher than is appropriate in context, creating, yet again, a false impression that the health risks posed by the MGP Wastes are less severe than is, in fact, the case.

## V. Plaintiffs Have Complied with the Notice Requirements under RCRA

138. On June 6, 2016, Plaintiffs sent, via certified mail return receipt requested, PG&E, DTSC, US/EPA, the California Environmental Protection Agency, the State Water Resources Control Board, and the San Francisco Regional Water Quality Control Board written notice of PG&E's violations of RCRA.

## CLAIMS FOR RELIEF

### COUNT 1
### Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*

139. Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

140. PG&E has contributed to the handling, storage, treatment, and/or disposal of MGP Wastes that exist on the Property.

141. PG&E dumped, leaked, discharged, spilled, injected, and/or placed MGP Wastes that exist on the Property.

142. The MGP Wastes, the handling, storage, treatment, and/or disposal of which PG&E has contributed as described herein, are solid wastes and/or hazardous wastes, which may present an imminent and substantial threat to health and/or the environment.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### COUNT 2
### Violations of California State Nuisance Law, Cal. Civil §§ 3479 *et seq.* – Private Nuisance

143. Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

144. Plaintiffs are the owners of the Property; and Plaintiffs occupy the Property.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                           29

145.    PG&E by causing MGP Wastes to be disposed in and around the soils of the Property have created a condition that is harmful to health, is offensive to the senses, and/or interferes with Plaintiffs' comfortable enjoyment of life and property.

146.    This condition has interfered, interferes, and is substantially certain to interfere in the future, with Plaintiffs' free use or enjoyment of the Property, and has caused, is causing, and is likely to cause Plaintiffs in the future, substantial emotional distress and inconvenience.

147.    Plaintiffs did not consent to PG&E's conduct alleged herein.

148.    An ordinary person would be reasonably annoyed or disturbed by PG&E's conduct alleged herein.

149.    PG&E's conduct alleged herein was a substantial factor in causing Plaintiffs' harm. And as a direct and legal cause of the PG&E's wrongful acts and/or omissions alleged herein, Plaintiffs have suffered and will suffer harms, injuries, and/or losses as herein set forth, economic or otherwise.

150.    The seriousness and/or gravity of this harm out weighs the social utility of PG&E's conduct alleged herein.

151.    The acts and omissions of PG&E alleged herein were done with malice, fraud, and/or oppression as herein set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### COUNT 3
### Violations of California State Trespass Law

152.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

153.    Plaintiffs are the owners of the Property; and Plaintiffs occupy the Property.

154.    Without Plaintiffs' consent, PG&E intentionally, recklessly, or negligently entered the Property, by way of allowing MGP Wastes under Defendants' control to escape into the environment and settle onto and into the Property. PG&E's operation of the North Beach MGP's, further, constitutes an ultrahazardous activity.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                    30

155.   As a proximate result of PG&E's entry onto the Property, Plaintiffs have been injured, are being injured, and are substantially certain to be injured in the future, including but not limited to lost use of property, lost profits, denial of useful and quiet enjoyment of property, and losses related to MGP contamination.

156.   The wrongful acts of Defendants were done maliciously, oppressively, and fraudulently, as herein set forth.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT 4
### Violations of California State Negligence Law

157.   Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

158.   PG&E was negligent in its acts and omissions concerning its operation of the North Beach MGP, including without limitation its storage, disposal, transportation, cleanup, and remediation of MGP Wastes.

159.   As a proximate result of these negligent actions, Plaintiffs have been harmed including without limitation in the ways set forth herein.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT 5
### Violations of California State Strict Liability Law

160.   Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

161.   PG&E was engaged in the operation of the North Beach MGP, which includes without limitation the creation and refinement of gas from coal and oil and disposal of wastes created thereby; the operation of an MGP constitutes an ultrahazardous activity.

162.   The harms suffered by Plaintiffs, as set forth herein, are the kinds of harms that would be anticipated as a result of the risk created by operation of MGPs.

163.   As a proximate result of PG&E's operation of MGPs, Plaintiffs have been harmed in the manners set forth herein.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                                          31

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and further relief as follows:

1.     This Court declare PG&E in violation of the RCRA.

2.     This Court declare PG&E responsible for remediation of the MGP Wastes located on the Property.

3.     This Court permanently enjoin PG&E to fully and adequately remediate the Property of MGP Wastes and abate the nuisance and trespass created thereby;

4.     This Court permanently enjoin PG&E to take all other actions necessary to address imminent and substantial endangerment that may be presented by the MGP Wastes on the Property;

5.     This Court order Defendants to pay civil penalties, including without limitation pursuant to 42 USCS § 6928 and 40 C.F.R. §§ 19.1 *et seq*.;

6.     This Court award Plaintiffs damages in an amount to be proved at trial, including without limitation pursuant to Cal Civ. Code §3334 and punitive damages;

7.     This Court award Plaintiffs the costs of suit herein, including attorneys' fees and expert witness fees, including without limitation pursuant to 42 U.S.C. § 6972(e); and

8.     This Court grant such other and further equitable or legal relief as the Court deems just and proper.

Dated: May 9, 2017           **GROSS & KLEIN LLP**

By:    */s/ Stuart G. Gross*
           STUART G. GROSS

          *Counsel for Plaintiffs*

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT           32

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.


Dated:  May 9, 2017                    **GROSS & KLEIN LLP**



By:    */s/ Stuart G. Gross*
              STUART G. GROSS

              *Counsel for Plaintiffs*

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA
94111

COMPLAINT                                                                          33